**HILGRAEVE CORPORATION, Plaintiff–Appellant,**

v.

**McAFEE ASSOCIATES, INC. (now known as Network Associates, Inc.), Defendant–Appellee.**

Nos. 99–1481, 99–1491.

United States Court of Appeals, Federal Circuit.

Aug. 2, 2000.

Ernie L. Brooks, Brooks & Kushman P.C., of Southfield, Michigan, argued for plaintiff-appellant. With him on the brief were Robert C.J. Tuttle, Thomas A. Lewry, and Frank A. Angileri.

Michael Barclay, Wilson Sonsini Goodrich & Rosati, of Palo Alto, California, argued for defendant-appellee. With him on the brief were Peter P. Chen, David L. Larson, David L. Larson, Colleen Bal, and Behrooz Shariati. Of counsel on the brief was R. Terrance Rader, Rader, Fishman & Grauer PLLC, of Boomfield Hills, Michigan.

Before MICHEL, LOURIE, and RADER, Circuit Judges.

RADER, Circuit Judge.

On summary judgment, the United States District Court for the Eastern District of Michigan determined that the VirusScan product of McAfee Associates, Inc. (MC) * does not literally infringe Hilgraeve Corporation's U.S. Patent No. 5,319,776 (the '776 patent). *See Hilgraeve Corp. v. McAfee Assocs., Inc.,* 70 F.Supp.2d 738 (E.D.Mich.1999). The district court also estopped Hilgraeve from arguing that VirusScan infringes any claim of the '776 patent under the doctrine of equivalents. This court affirms the district court's finding that prosecution history estoppel bars application of the doctrine of equivalents. This court vacates, however, the grant of summary judgment of no literal infringement and remands for appropriate further proceedings.

I.

Hilgraeve's '776 patent, entitled "In Transit Detection of Computer Virus with Safeguard," describes a program that scans for computer viruses. The claimed invention scans a body of data during its transfer, i.e., before storage of the data with potential viruses on the destination storage medium. If the program detects signs of a virus during the scan, the program automatically blocks storage.

---

* Now known as Network Associates, Inc.

Claims 1 and 18 of the '776 patent are at issue. Claim 1 reads as follows, with language in dispute underlined:

1. In a system for transferring digital data for storage in a computer storage medium, a method of screening the data as it is being transferred and *automatically inhibiting the storage of screened data* containing at least one predefined sequence, comprising the steps of:

causing a quantity of digital data resident on a source storage medium to be transferred to a computer system having a destination storage medium; receiving and screening the transferred digital data *prior to storage on the destination storage medium* to determine if at least one of a plurality of predefined sequences are present in the digital data received; and in response to said screening step:

    (a) automatically causing the screened digital data to be stored on said destination storage medium if none of the plurality of predefined sequences are present and

    (b) *automatically inhibiting the screened digital data from being stored on said destination storage medium* if at least one predefined sequence is present.

'776 patent, col. 17, ll. 9–29 (emphasis added). Claim 18 reads as follows:

18. A method of preventing the spread of computer viruses to a computer having a storage medium, comprising the steps of:

simultaneously searching for a plurality of virus signatures, each of which comprising an identifiable digital sequence, while said computer is receiving a stream of digital data for storage on said storage medium;

providing an indication of the detection of a virus from said searching step; and

*automatically inhibiting the storage of said digital stream on said storage medium* if any of said virus signatures have been detected.

*Id.* at col. 28, ll. 45–57 (emphasis added). Because these claims require inhibition of storage, the district court construed the meaning of the word "storage" in the temporal context of the patent. The district court construed "storage" as occurring "when the incoming digital data is sufficiently present on the destination storage medium, and accessible by the operating system or other programs, so that any viruses contained in the data can spread and infect the computer system." *Hilgraeve*, 70 F.Supp.2d at 745. This definition is consistent with the district court's interpretation of the patent claims as requiring scanning prior to storage. *See id.* at 748. Neither party disputes the court's claim construction.

Hilgraeve contended that McAfee's accused product, VirusScan, infringes independent claims 1 and 18 and dependent claims 2 and 6 of the '776 patent. In other words, Hilgraeve alleged that VirusScan screens incoming digital data for viruses during transfer and before "storage" on the destination storage medium. McAfee, on the other hand, asserted that VirusScan does not infringe because it screens the incoming digital data only after it has been transferred and "stored" on the destination storage medium. Thus, the critical issue in the infringement analysis is whether VirusScan screens before, or after, the time at which incoming data is present on the destination storage medium and accessible by the operating system and other programs.

To resolve this issue on summary judgment, the district court relied solely upon expert testimony about the operation of VirusScan. The district court declined to entertain a declaration and accompanying exhibits offered by one of the co-inventors of the '776 patent, terming this evidence "a thinly veiled effort to introduce expert testimony in an improper manner." *Id.* at 754. The district court also declined to consider McAfee promotional materials de-

scribing VirusScan. Hilgraeve asserted that these promotional materials showed that a user of VirusScan would perceive that the program operates as outlined in the claims of the '776 patent. The district court pointed out that infringement is not a question of user perception of operation, but of actual operation. Therefore it declined to consider the promotional literature. *See Id.* at 756.

## II

■■■ This court reviews the district court's grant of McAfee's motion for summary judgment of non-infringement without deference. See *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994). A summary judgment may stand when the record shows no genuine issues of material fact and entitlement to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). In granting summary judgment, the district court must draw all reasonable inferences in favor of the nonmovant. See *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116, 227 USPQ 577, 581 (Fed.Cir.1985) (en banc).

## III.

■■■ The district court based its summary judgment on the testimony of experts who had tested VirusScan and interpreted the VirusScan code. In examining the appellate record for genuine issues of material fact, this court notes disagreements between the experts. McAfee's expert, Mr. Belgard, opined on the basis of his studies that VirusScan first stores digital data and then screens for viruses, and so does not infringe the '776 patent. Hilgraeve's expert, Dr. Geske, on the basis of his own technical studies and consideration of deposition testimony of McAfee's designated witness on infringement, Mr. Kuo, reached a different conclusion. Dr. Geske characterized Mr. Belgard's description of VirusScan's operation as over-simplified and opined that his tests were not probative on the question of infringement. Thus, Dr. Geske concluded that VirusScan infringes the '776 patent. While disagreements do not always create genuine issues

of material fact, on this record the conflicting allegations of experts leaves material factual questions unanswered.

The experts described the operation of VirusScan in different ways. McAfee's expert described VirusScan's operation in terms of a sequence of steps. In this sequence, first (step 1) an application program transfers all the data for storage to a file on the destination storage medium, then (step 2) the application program makes a request for the operating system to close the file containing the transferred data. If it is operating, VirusScan intercepts (step 3) the program's request to the operating system to close the file. According to Mr. Belgard, by the time VirusScan intercepts the "close file" command, all the requested data has been transferred and stored in a designated file on the destination storage medium. Later, (step 4) VirusScan makes a call to the operating system to close the file on behalf of the application program. Now, critically to McAfee, (step 5) the operating system closes the file, releases the transferred digital data that it has maintained on behalf of the application program, and returns control back to VirusScan. McAfee's expert asserted, on the basis of his testing, that at this point the operating system has made all the data transferred to the file available to the computer system. In other words, the destination storage medium – e.g., a hard disk drive – has already completely "stored" the data, as the district court defined "stored." In this description, because VirusScan permits storage, the operating system and all other application programs can copy and execute the file even if it contains a virus. According to McAfee, VirusScan only scans for viruses in the next step, (step 6). If VirusScan detects no viruses, it then returns control (step 7) to the application program. If it detects a virus (step 8), VirusScan calls the operating system to delete the file or perform a user-selectable option. Finally, (step 9) the operating system responds to the VirusScan call and deletes the file or performs the selected option.

McAfee thus based its defense on step 5 and the immediately preceding steps. According to McAfee's expert, step 5 concludes the process of "storage" as the district court defines that term. Because scanning occurs after step 5, VirusScan cannot, by this interpretation, infringe the '776 patent.

Hilgraeve's expert, for his part, described VirusScan's operation differently:

> VirusScan modifies the operating system's "call-return mechanisms" used for file I/O such that VirusScan inhibits return to the calling process (a user application program, or command). When VirusScan detects an infected file, VirusScan maintains control of the system until it has completed the operations it has been preconfigured to perform, i.e., delete the infected file or move the infected file to a quarantine area.

In this description, VirusScan manipulates the operating system to prevent an application program from having access to the data during and possibly beyond the scanning process. Further, Hilgraeve's expert avers, if VirusScan detects an infected file, it continues to inhibit storage or access to that file until the infected data is deleted or quarantined. Thus, because the district court defined "storage" as both "present on the destination storage medium" and "accessible by the operating system or other programs," Hilgraeve contends that VirusScan does not store before scanning. Specifically, VirusScan defeats the "accessibility" component of the district court's definition of "storage."

These differences in the experts' descriptions of VirusScan's operation raise a genuine issue of material fact. The record shows a genuine and material conflict over the interaction of VirusScan with the computer's operating system arising from the differing explanations of the operation of VirusScan. Moreover the record does not conclusively describe VirusScan's interaction with the computer's operating system. McAfee's expert does not describe VirusScan's inhibition or manipulation of the operating system. Instead, this expert

states that VirusScan makes the infected program available to the computer in general (an operation which defeats infringement) by a normal call from the application program to the operating system to close the file. Hilgraeve's expert, however, understands VirusScan to interact with the operating system itself to make an infected program inaccessible. The determination of whether either description (or neither) is correct requires a factual determination of the actual operation of the VirusScan program, particularly its interaction with the operating system. The testimony of neither party's expert reveals enough of such a determination to resolve the issues on this record.

Hilgraeve's expert specifically contests the validity and relevance of the three tests offered by McAfee's expert to "confirm" his stepwise interpretation of the operation of VirusScan. For example, in all of these tests McAfee's expert set the "Action" option in VirusScan to stop the program upon detection of an infected file and to ask the user whether to delete the file. However, claim 1 of the '776 patent requires that, in response to the virus screening, the invention "automatically" either stores an uninfected file, or inhibits the storage of an infected file. *See* '776 patent, col. 17, ll. 21–29. The inventor himself asserted while prosecuting the patent that his invention requires the user to perform "only one step."—"The user simply initiates the data transfer." Thus a scanning program that does not automatically inhibit storage of an infected file cannot infringe the '776 patent. While VirusScan's "Action" option can also be set to automatically delete files, McAfee's expert did not conduct his tests with the program used in this mode. Thus, the tests could not prove that VirusScan does not infringe the '776 patent. Further, the record does not reflect the expert's consideration of the differences between VirusScan's operation in the non-automatic mode, in which it was tested, from its operation in the automatic mode, the mode claimed by the patent. McAfee's expert, Mr. Belgard, is only con-

clusory on this question, stating: "the results of my tests are equally applicable . . . regardless of how the 'Action' setting is set." Neither the tests nor any analysis in the record necessarily supports this conclusion. On the other hand, Hilgraeve's expert offers a similarly conclusory opinion that he "do[es] not believe Mr. Belgard could duplicate any of his 'tests' for any of the 'automatic' configurations of Virus-Scan. . . ." If the tests—McAfee's only evidence proffered to "confirm" its expert's interpretation of the VirusScan code—are to show non-infringement at all, the record must show that the choice of user intervention in VirusScan's "Action" setting does not affect the mechanism of storage or inhibition of storage of infected files.

Questions reaching beyond the effect of the "Action" cast doubt on whether McAfee's tests could really answer the question of whether VirusScan infringes the '776 patent. The first test involved a file transfer over a network from a computer with VirusScan to one without VirusScan. The '776 patent describes a system which screens transferred data upon receipt, not transmission. *See* '776 patent, fig. 6; col. 17, l. 17. Therefore, in such a transfer, the screening program must be able to operate on the data as it is received in the second computer. This record on appeal does not show that such operation was possible in this test configuration.

The second test involved a file transfer over a network, from the hard disk of a computer without VirusScan to a floppy disk, the destination medium, on a computer with VirusScan operating. VirusScan detected the virus and, having been configured to do so, displayed a prompt box asking the user what further action to take. At this point, examination of the file on the floppy disk showed that when the prompt box appeared, the infected file had been stored and was accessible. But VirusScan in the non-automatic inhibition mode, as used in this test, itself cannot infringe the '776 patent, which calls for automatic inhibition of storage upon detection of a virus. Once again, a test disabling the automatic capabilities of VirusScan

is not probative of whether VirusScan may infringe in the automatic mode.

The third test involved a transfer of an infected file from the floppy drive on a computer to the hard drive, the destination medium, on the same computer, with VirusScan operating. VirusScan detected the infected file and, because it was so configured, displayed a prompt. Instead of responding to the prompt at this point, McAfee's expert removed the floppy disk and rebooted the computer, later finding that the infected file had been transferred to the hard drive and was accessible. Again, this test is not probative of any issue in the infringement analysis, for the same reasons that the second test is not probative. In addition, the record here does not contain any indication that the expert considered the relevance of the reboot process to the method in the '776 patent. Moreover the record does not show consideration of the effect of the reboot process on the operation of Virus-Scan itself, or its interaction with the operating system. Hilgraeve's expert testified that the rebooting process "prematurely" terminates a computer's normal operating system functions. According to this expert, VirusScan operates by preventing an operating system from having access to an infected file. Therefore, because rebooting disrupts the normal operating system, the disputed test does not show whether VirusScan prevented that access. In addition, this summary record does not disclose the effect of the rebooting process on the operation of VirusScan itself. Accordingly, this test as well does not resolve the infringement question.

## IV.

■ Although the parties nominally agree on the district court's claim interpretation, Hilgraeve also argued before that court that the phrase "prior to storage" must be construed from the ordinary user's perspective, i.e., that whether or not VirusScan screens before or after storage, it will infringe if the user perceives that

screening occurs before storage. As support for this argument, Hilgraeve refers to comments the applicant made to the Patent and Trademark Office (PTO) during prosecution, in support of the amendments to its application which resulted in allowance. The amendments added, *inter alia*, the phrase "prior to storage on the destination storage medium" to claim 1. *See Hilgraeve*, 70 F.Supp.2d at 750. In its comments to the PTO, Hilgraeve asserted that "the Applicants' invention requires only one step. The user simply initiates the data transfer. The program automatically screens the data, as it is being transferred...." Hilgraeve asserts that this comment means that the patented invention requires only that the user perceive screening before storage, regardless of how the program actually operates.

The district court correctly found nothing in the intrinsic evidence to support Hilgraeve's argument based on the perception of the program's operation. *See Hilgraeve*, 70 F.Supp.2d at 756. Neither the claims nor the rest of the specification of the '776 patent show that the invention involves the user's perception of the program's operation. The written description supplies some suggestions for user interaction with the program to direct inspection for certain specific error protocols. The claims of the '776 patent, however, do not claim a method of screening data "so that the user perceives that screening occurs before storage," but instead claims a method of actually screening before storage. The patentee claimed a technical method, not a method for projecting a perception.

## V.

The district court found Hilgraeve estopped from claiming infringement under the doctrine of equivalents by any product that screens for viruses after "storage." As originally submitted, the application that led to the '776 patent did not contain claim 18. Claim 18 was added in the applicant's first response to rejection of all its claims. In this response, the applicant stated to the examiner that "[t]he present invention also has the capa-

bility to respond to the detection of a virus by *not only* preventing the copying of the complete file, but also...." (Emphasis added.) In other words, the applicant was stating that when the scanning program detected a virus, it prevented the copying of the complete file (among other things). Because an incomplete file would not be "sufficiently present on the destination storage medium, and accessible by the operating system or other programs" (except perhaps for erasure), the patentee may not now assert equivalents to claim 18 that allow screening after storage. *See Hilgraeve*, 70 F.Supp.2d at 748–50. Claim 1 acquired the phrase "prior to storage on the destination storage medium" in a later amendment, after which the patent was granted. Hilgraeve admits that it amended its claims to specify screening "prior to storage" to procure its patent. A surrender of subject matter during patent prosecution may preclude recapturing any part of that subject matter, even if it is equivalent to the matter expressly claimed. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 117 S.Ct. 1040, 1044, 137 L.Ed.2d 146 (1997). In other words, prosecution history estoppel bars recapture of subject matter surrendered during prosecution. By limiting the added claim 18 to screening before storage, and specifically adding "screening ... prior to storage" to claim 1, Hilgraeve surrendered the possibility of infringement by equivalence of any process that does not contain this modification, i.e., that screens after storage.

## VI.

Because neither McAfee's three tests nor either expert's analysis of the VirusScan code definitively answers the fundamental factual question of whether "storage," as defined by the district court, occurs before or after scanning in VirusScan, this court vacates the district court's grant of summary judgment of non-infringement and remands for further proceedings consistent with this

opinion. Because Hilgraeve surrendered, during prosecution, the option of accusing a product of infringing its patent by equivalents if it does not screen before storage, this court affirms the district court's holding that a product that screens for viruses after "storage" cannot infringe any claim of the '776 patent under the doctrine of equivalents.

## COSTS

Each party shall bear its own costs.

*VACATED–IN–PART, AFFIRMED–IN–PART, and REMANDED.*

**NUTRINOVA NUTRITION SPECIAL-TIES AND FOOD INGREDIENTS GMBH, and Nutrinova, Inc., Appellants,**

v.

**INTERNATIONAL TRADE COMMISSION,**
**Appellee,**

**and**

**Hangzhou Sanhe Food Company Ltd., Hangzhou Sanhe Food Additives Factory, JRS International, Inc., Dingsheng, Inc., and WYZ Tech, Inc., Intervenors.**

**No. 99–1293.**

United States Court of Appeals, Federal Circuit.

Aug. 25, 2000.

Larry L. Shatzer, II, Foley & Lardner, of Washington, DC, argued for appellants. With him on the brief were Charles F. Schill, and Melinda F. Levitt.

Cynthia P. Johnson, Attorney, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, argued for appellee. With her on the brief were Lyn M. Schlitt, General Counsel; James A. Toupin, Deputy General Counsel; and Rozann M. Stayden, Attorney.

Gary M. Hnath, Venable, Baetjer, Howard & Civilettti, LLP, of Washington, DC, argued for intervenors. With him on the brief was Michael P. Leary.

Before PLAGER, LOURIE, and BRYSON Circuit Judges.

PLAGER, Circuit Judge.

Nutrinova Nutrition Specialties and Food Ingredients GmbH, and Nutrinova, Inc. (collectively, "Nutrinova") own U.S. Patent No. 4,695,629 ("the '629 patent") which covers a process for producing an artificial sweetener, acesulfame potassium ("ASK"). After examining sample batches of ASK imported from the People's Republic of China which raised concerns that the samples were produced by unauthorized use of its patented process, Nutrinova requested that the International Trade Commission ("ITC" or "Commission") enjoin the importation of allegedly infringing ASK from China for violation of 19 U.S.C. § 1337 (1994). Section 1337 generally prohibits importation into the United States, the sale for importation, or sale within the United States after importation of a product that infringes a United States patent. After an investigation, the Commission found no infringement and declined to enjoin importation of ASK from China.

Nutrinova appeals from the Commission's findings and conclusions, arguing that, under 35 U.S.C. § 295 (1994), the Commission should have shifted the burden to the accused infringers to disprove infringement, rather than requiring that Nutrinova assume the burden of proving infringement. This is a case of first impression regarding the interpretation of § 295. Because there was no error in the manner in which the Commission allocated the burden of proof, and because substantial evidence supports the Commission's findings, we affirm.

## BACKGROUND

ASK is a high-potency artificial sweetener presently used in a wide variety of food

and drink products. There are several established methods of manufacturing ASK. Since different ingredients and steps are used, the different methods of manufacturing ASK typically produce batches with different by-products. The process covered by the '629 patent, also known as the sulfur trioxide ($SO_3$) process, uses common chemicals that do not require special safety handling. The patented process produces a product with high levels of sulfate by-products and, at most, minute amounts of fluoride by-products. In contrast, two other well-known processes for producing ASK, the fluorosulfonyl isocyanate ("FSI") process, and the aminosulfonyl fluoride ("ASF") process, use a series of toxic or hazardous substances. These processes produce products with little or no sulfate by-products, but a good amount of fluoride by-products.

Nutrinova obtained and tested two samples of ASK imported from China into the United States (designated by the parties as Fremd Nos. 127 and 128) and found that they contained high levels of sulfate and minute amounts of fluoride, characteristic by-products of the '629 patented process. Nutrinova then filed its complaint with the ITC, alleging that by reason of infringement of claims 1, 2, 3, 4, or 5 of the '629 patent, there was a violation of 19 U.S.C. § 1337(a)(1)(B) in the importation into the United States, the sale for importation, or sale within the United States after importation of ASK, blends of ASK, or products containing the ASK in question.

On November 14, 1997, the ITC ordered that an investigation be instituted. *See* 62 Fed.Reg. 62070 (1997). Nutrinova was named as the complainant, and Hangzhou Sanhe Food Co., Hangzhou Sanhe Food Additives Factory, JRS International, Inc., Dingsheng, Inc., and WYZ Tech, Inc. (collectively "Sanhe") were named as respondents.

The Commission assigned an administrative law judge ("ALJ") to conduct an Initial Determination, pursuant to the Commission's procedures. During the investigation, Nutrinova had difficulties obtaining Sanhe's cooperation in producing requested documents and information. For instance, despite receiving Nutrinova's document requests, Sanhe was slow in producing or allegedly did not produce a number of documents relating to the process it used in manufacturing its batches of ASK. In addition, Sanhe refused to permit a plant inspection, claiming it might violate Chinese law.

Nutrinova filed a motion to compel discovery. The ALJ granted the motion. At that point, Sanhe finally agreed to allow a plant inspection. When Nutrinova's personnel toured one of Sanhe's plants, they noticed that the walls had been freshly painted, which caused Nutrinova to speculate that the paint was necessary to cover up a recent conversion of the plant from use of one ASK manufacturing process to use of another one. Nutrinova's personnel took some samples of the ASK produced during the plant tour and had them tested. The testing showed that the samples from the plant tour had very low levels of sulfate and a significant amount of fluoride, unlike the two Fremd samples.

Sanhe also finally allowed Nutrinova to take the deposition of its chief chemist. During that deposition, Nutrinova learned from the chemist that Sanhe had, indeed, failed to produce certain documents that were responsive to Nutrinova's document requests.

Nutrinova filed a motion to sanction Sanhe for failing to comply with discovery orders. At this point Sanhe finally began to produce its documents, producing over 1,300 pages of documents from the close of discovery up to three days before the scheduled hearing. The ALJ, taking into account Sanhe's late production, advised Nutrinova that he would consider a motion to reopen the record at Sanhe's expense. Nutrinova declined to seek reopening of the record, preferring to stand on its objection to the admission of the late-provided evidence.

An evidentiary hearing was held from June 29, 1998, to July 10, 1998. On November 20, 1998, the ALJ issued a 227 page report, in which he determined that there was no infringement of the '629 patent by the respondents, and that consequently there was no basis to enjoin respondents' importation of ASK. On January 15, 1999, the Commission issued its Notice of final determination that there was no violation of § 1337, and that the Commission determined not to review the initial determination of the ALJ so finding, and not to review the ALJ's Order denying the motion for sanctions.

Nutrinova appeals from the Commission's final determination, raising three issues: under 35 U.S.C. § 295, should the ALJ have shifted the burden to the accused infringers to disprove infringement, rather than requiring that Nutrinova assume the burden of proving infringement; should the ALJ have imposed sanctions on Sanhe; and did the ALJ err in his fact-finding regarding whether there was infringement of the '629 patent.

## DISCUSSION

This is not a difficult case. Let us initially dispose of what is not in the case.

■ Nutrinova asks us to reexamine the findings that underlie the agency's conclusion with regard to non-infringement of the '629 patent. The Commission, acting through the ALJ, spent a week listening to various witnesses and then issued a detailed 227–page opinion. Under our review statute, the question before us regarding the fact-finding is whether substantial evidence in the record supports the agency's findings. *See* 19 U.S.C. § 1337(c) (1994); 5 U.S.C. § 706 (1994); *see also SSIH Equip. S.A. v. United States Int'l Trade Comm'n*, 718 F.2d 365, 371–72, 218 USPQ 678, 684 (Fed.Cir.1983). Even if we might have found some of the facts differently, or even if we might have drawn some inferences from the facts dif-

ferently, none of which we are inclined to do, that is not the role of an appellate court. Nutrinova invites us to reweigh the evidence and reexamine the credibility of the witnesses. We decline the invitation.

■ The primary issue in the case is whether the ALJ properly applied 35 U.S.C. § 295 to the case before him. As with other legal issues, we review the legal conclusion regarding proper application of § 295 without deference to the Commission. *See SSIH Equip.*, 718 F.2d at 371–72, 218 USPQ at 684.

This is a case of first impression. The statute at issue, 35 U.S.C. § 295, is relatively new, enacted in 1988 as part of the Omnibus Trade and Competitiveness Act and last amended in 1994 to read:

§ 295. Presumption: Product made by patented process

In actions alleging infringement of a process patent based on the importation, sale, offer for sale, or use of a product which is made from a process patented in the United States, if the court finds—

(1) that a substantial likelihood exists that the product was made by the patented process, and

(2) that the plaintiff has made a reasonable effort to determine the process actually used in the production of the product and was unable so to determine,

the product shall be presumed to have been so made, and the burden of establishing that the product was not made by the process shall be on the party asserting that it was not so made.

■ The statute on its face is a burden shifting mechanism. As a general proposition, the law places the burden of proving infringement on the patentee who alleges it. When two conditions are met, the statute shifts that burden and requires the alleged infringer to disprove infringement. The two conditions are that a finding is made by the court[1] that: 1) a substantial

---

However, the Commission did not raise that point, and we therefore treat it as waived for

purposes of this opinion.